We are now recording. Hear ye, hear ye, this Honorable Appellate Court for the Second Judicial District is now in session, the Honorable Susan F. Hutchinson presiding. Your Honors, the first case on the docket this morning is 2-21-0370, Enray the Marriage of Monica I. Billington, Petitioner Appellee, and James E. Billington, Respondent Appellant. Arguing for the Appellant, Mr. Anthony Simarco. Arguing for the Appellee, Mr. Paul L. Feinstein. All right, good morning, counsel, and a few other people here. I see Mr. Feinstein, is your client on line two? Your Honor, my client will not be attending this morning. Okay, all right, okay, so, all right, it's, I guess it's your client, Mr. Simarco, would that be true? Yes, Your Honor, Mr. Billington is here. Yeah, sorry, without seeing people, I can't remember who's who. All right, if you are ready, then you may proceed, Mr. Simarco. Good morning, Anthony Simarco of the Stocksdale Law Firm, appearing on behalf of the Appellant James Billington. Thank you for an opportunity this morning for presenting oral argument. I'm absolutely confident that this Court is fully aware of the statutory provisions which we cited in our Appellant's brief, relative to Section 504 on maintenance. Those provisions require the Court to consider approximately 14 factors, and then, if the Court determines that maintenance is appropriate, it must apply guidelines. Well, Mr. Simarco, let me ask a quick question here. Weren't your clients invited, I'll use that term rather than ordered, but invited by the Court to come to some resolutions of things, and then the items that were left would then be heard before the Court? Well, I don't know what that process entailed, Your Honor. After repeatedly reviewing the transcripts of proceedings, it is very difficult to tell what exactly that procedure was. That's the problem here. But your client, or you, you drafted, or someone on your behalf for your client drafted some sort of proffer that was given to the Court that the Court worked from to determine what needed to be heard, correct? That's not the process exactly, Your Honor. Please explain to me what it is. Sure. So, what the parties agreed to when they appeared before Judge Reedy on the 17th of and dissipation. And then the deal was that each party would then submit a proposed judgment, and then Judge Reedy was free to rule in the manner he felt appropriate just by looking at the respective offered judgments of the parties without hearing... What was the judgment that was proposed with respect to maintenance by your client? Your Honor, I'm sorry, I didn't hear the first part of your question. What was the judgment proposed with respect to maintenance by your client? Jim proposed a $5,000 per month maintenance payment based on his gross base income of $257,800, and that the maintenance payment would be reviewable 60 months. And he proposed that an additional maintenance amount would be paid on income over the $257,800. Where we really kind of fall into the swamp is the remainder of the suggestion is basically that Mr. Rose suggested James' one-time big bonanza that he had received in 2006 or 2007 of $7 million when his company sold plus $700,000 as a gross bonus would be excluded from calculations of maintenance. And Mr. Roe was willing to agree that Mr. Billington's highest income that he had ever received during the course of the marriage, accepting, taking out of the equation, the money that resulted from the sale of that company in 2006 or 2007. And how much money was that total? Well, the parties throw around the number. It was either $7 million or $6 million or $700,000 in addition. But they went through all that money, correct? They did. They did. Must have taken some effort. The point is I understood now we're getting a little bit away from property distribution, which was the issue, but there was an issue of what would be the cap. And the $700,000 was like a consulting fee, which would be, I believe, and again, it's hard to tell from this record, but I thought it was like a consulting fee so that the purchaser of the business would have some guidance through a period of time. And so that could be considered, if that's the case, that could be considered a salary, correct? Well, Judge, I agree with the last part of your statement, but I don't believe that the $700,000 was set aside for some consulting fees. I think that that was part and parcel of the whole transaction. There was $183 million sale. As a result of James' interest in the company, he received either, I don't know, $6 million or $7 plus $700,000 as a bonus. A bonus for what? A bonus for what? For finding the buyer? If he's part of the business, why is he getting a bonus? I have no idea, Your Honor. The record is absent any testimony on that issue. Let me ask this question. You referred many times to not being able to decipher things from the record. James filed a motion to reconsider and the court ruled motion to reconsider, but we don't have a transcript of the arguments of the hearing on the motion to reconsider. We just have the words stating, for the reasons stated of record. We don't have that record. Don't we presume that the trial court's judgment was correct? I didn't file. My notice of appeal doesn't attack the ruling on the motion to reconsider. My notice of appeal is geared significantly around the judgment. Well, the trial court reviews the judgment during a hearing on a motion to reconsider. Your Honor, I think I'm not required to appeal the ruling on the motion for reconsideration. I can appeal specifically judgment exclusively. But the trial court provides additional rationale for its judgment during a hearing on a motion to reconsider as reflected in the order. I mean, I guess, you know, Justice Burkett's issue and was mine as well, is if there is anything that the court said or did or recalculated or anything that he did with reference to the then that would have been helpful in considering this particular issue. And so you don't have to file it. But what I think we're both saying is it certainly would have been helpful if we knew what exactly happened there. Well, what really happened, Judge, is pretty clear. Judge Reedy denied the motion to reconsider. So he didn't change anything about the judgment. And at the motion for reconsideration, there couldn't have been any additional evidence offered because a motion to reconsider is just based on what evidence the court had already had. Can you address Monica's argument that this is an invited error because of James Counsel's comments on the record? In what part of the proceeding, Your Honor? For example, January 26, Counsel for James said we should add in the amount equal to 27.5% of his gross income over his base income. James Counsel made those remarks. Your Honor, I think that was Monica's counsel making those remarks. I think that was John Demling making those remarks and Mr. Rose saying, no, no, I want to make the record here that what I'm suggesting is that the statute be applied, that the guidelines of the statute be applied. You're right. I was misreading my notes from the record. On February 21, James filed a motion to reconsider and a motion to reopen improves, arguing that the percentage of his gross income was impermissible because it deviated from statutory guidelines. You're right. One other thing, Mr. Smarco. In your brief, when we talk about maintenance, the heading says that maintenance was reserved, but then you go on and talk about maintenance being reviewable. Did you mean maintenance should be reviewable? Because reserved would have a totally different implication. I think that the parties both agreed and they presented that to Judge Reedy on September 17, that the maintenance would be for a period of five years reviewable. Okay. But this is a 29-year marriage, correct? Yes. And that is by statute a long marriage. And with the spouse requesting the maintenance or entitled to the maintenance, the amount of maintenance is calculated over the entire period of time. So what are we reviewing it for? I would tend to agree with Your Honor. There's maybe one exception to that basic rule. I agree that recipients of maintenance in long-term marriages where they don't have an established work history or an employment history or show for some reason a lack of ability to be self-supporting or age, maintenance is probably not something that's a good ruling. But how is it a good ruling in this case? How old was she when they got the divorce? I think around 56 or 57. She's raised the kids. She's never really had an occupation or a job. She's married 29 years in her 50s. Maintenance is intended to be rehabilitative, correct? I mean, how are you going to rehabilitate a 56-year-old woman to start this job? I agree with you. The maintenance shouldn't have been reviewable. And I was trying to get to the point that reviewable maintenance may be appropriate in some circumstances. For instance, if there is a $7 million estate and the wife is getting $6.5 million of that estate, reviewable maintenance may be appropriate. That's not the case here. Well, there's no way to tell here. What? There's no way to determine that because there are no values ascribed to all of the assets in the estate. He says, look, I don't have enough evidence to tell you guys what the rest of the numbers are because you didn't give it to me. So I can't begin to imagine what the value of the marital estate is and what- We know the value of the home. We only knew the listing price of the home. And there's a mortgage on it. Two mortgages. Two mortgages on it. So it's not like the value of that property is going to be something that's going to catapult this woman into a wonderful life, is it? Maybe not. But you can't pick one asset respectfully, Your Honor, and say, hey, well, you know, there was only $200,000 in equity in the marital home. Tony, where are you coming up with this $6.5 million number? There wasn't any evidence on any of the other assets. Generally, she was awarded $400,000 worth of jewelry. No appraisal. Well, he was- They agreed that it was that. No, Your Honor. It was not a stipulation on the value of that jewelry. Not on the record, but they agreed that she would get the jewelry and he would get the classic cars. Although for the life of me, I wonder how the- I had one and I didn't know it was a classic car, the Suburban and something else that might be a classic car. I just know my Suburban was not a classic car. So, you know, I've been to Mecham auctions. I've seen what they get. I mean, but if they agreed that she could keep her $400,000 worth of jewelry or her $10 million worth of jewelry, and he could keep his little cars that he apparently was purchasing for investment, why does the court have to go through those numbers? The court really wouldn't. The problem here arises in the process prescribed and agreed to by Judge Reedy. The parties asked him, let's take a little bit of evidence on dissipation and debt, and then we'll submit our Christmas lists to you. And you can selectively pick from those Christmas lists on how this judgment is going to come out. Okay. But when you get to the proffered judgment, it gets to be a little bit different. Monica then asks for one of the cars plus the jewelry and claims that it's hers. So there's a lot of inconsistency between what they present to the court and how these judgments get submitted to the court. Absent any evidence. Well, which car did she get or want? I think she got one of the Chryslers. It was, I know it was purple in color. She got a 2010 Dodge Challenger. Not a Dodge Challenger. I'm not a car guy, excuse me. Neither am I, but that's not a classic either, to the best of my knowledge. I mean, the three that surprised me were the 2010 Dodge Challenger, which has some value because it drives, it works. The 2004 Suburban, I think mine was a little more recent. Suburbans are the biggest thing right now. I know, but you can't afford them. But well, anyway, I mean, he got his Camaro. It's a good price, his Caprice. I don't know why people like 1970 Caprices, but they do. We got a Roadrunner. Those all have value, but they agreed that that's the way it would go. So I guess if the parties agree generally, how, and they don't present any evidence and they agree not to present any evidence, how is the judge supposed to then determine the value? That's a very good question, Your Honor. Why would he need, why would he need to determine? I would really like some additional time to continue answering your questions. I think it's very important. You can answer the question. Let's answer both my question and Justice Shostak's question that she threw in. Why would he need to determine a value if they've agreed? Because the court cannot decide that the value of the marital estate is based on two assets or one asset or three assets. It can't possibly reach an informed decision unless you hear evidence about what the debts are as well. How do we net out the marital estate? How do we do that unless there's evidence and testimony? The only other way is by stipulation. And there is no stipulation offered by the parties to the court in this respect. And Justice Shostak, I'm sorry, I didn't hear your question. I guess you may have answered it, but my question was, why would he need to show that when it was agreed? I don't think it was agreed because the court is entrusted with making these certain findings, both for maintenance and for property. And the court can't guess. The court is required to make certain findings as to the value of property and the distribution of that property. There are 14 factors, as we all know, in 503. And then in 504, there may be 15 plus any other factor in reference to the maintenance award. It seems that you're blaming the court for the failure of the parties to present evidence. Judge, the court, without meaning any disrespect, has some responsibility for the conduct of its cases. How could Judge Reedy put himself in the situation where he hears the trial on the issues of dissipation and debt, but he gets no other evidence other than the Christmas lists? There is no evidence for the court to decide anything else other than the dissipation and the debts. So I cited the Selecky case in my brief. And I think that the tenant of the Selecky case, I don't want to misquote it here. An agreement by the parties cannot legitimize a departure that the trial court has no power in its own right to grant. The court still has to make consideration of the factors in 503 and 504, regardless of what the parties agreed to. So the court has to, I guess you're saying the court has an obligation to, after the Christmas list, or I think we'll call it what we usually do, the proffered judgment, proffered lists are submitted, has to go out and price the Camaro, price this, price that. We already know what the debts are, and we already know what the dissipation claim is. What authority does a court have to do that? I'm sorry, Judge, why does... have to go and look up those prices and those values themselves? There was an option that the court had. If the court didn't get values on assets and was interested in doing something different, other than relying on the proffered judgments to make a determination, those assets could have been liquidated. He could have ordered the assets sold and whatever money generated by those assets could then be distributed as part and parcel of the marital estate. And maybe if they had been married for 15 years, that would have been an option. These people were married for almost 30 years, and these properties were valued by them. So what's the purpose of selling them? They were not valued. If you look at... not dollars and cents, they were appreciated by the parties. She liked her jewelry, he liked his cars. That's the value I'm talking about. They had a personal value to these parties, and that's the way they agreed to do it. So all right. Well, counsel, your time is up, but you will have an opportunity for response. We have some other orals to do. So as much as I know we'd like to talk about this case for a long time, we do have to get moving. So you'll have an opportunity for reply. Okay, thank you. Now, counsel, Mr. Feinstein, you may proceed. Thank you, Your Honor, and may it please the court again and counsel, Paul Feinstein for Monica Billington. All three of James' issues claim some sort of abuse of discretion, but at least one reasonable person could agree with how the trial court handled this, particularly based on the circumstances of what the parties and their lawyers were willing to bring in to the judge. And significantly, the court did find, after hearing some evidence, that James' earning ability is much greater than Monica's, and this drives all of the court's rulings. Now, if counsel was correct that the judge in all cases had to value all the assets, make all the statutory findings, we would never have agreed divorces in Illinois or prove-ups, because as we know, in the prove-ups, you just generally go through the asset list, and if it's the party's agreement, then the court will accept it. That's what happened here. This is all in my statement of facts of the blue brief. I didn't have quite as much a problem seeing what first in September 2020, and then thereafter, brought certain agreements to the judge. There were three aspects to it. There were things that they agreed on. Both of them agreed on the $5,000 a month, and by the way, Monica never agreed to a five-year reservation. That's nowhere in the record. The second thing, there were things they were going to argue, and they allowed the judge to make the ruling. That's why I referred to the binding pretrial in the Patel case, and that was the percentage, the issue of the gross versus net. The judge was going to make that call, and that was it, and then three, the more traditional presenting of the evidence, and the judge would decide. That was the debt and dissipation, and this was specifically done to try and save the party's money, and James's lawyer, Mr. Rowe, called it a cost-effective and direct approach, and yet here we are before you. It's a bit ironic, I guess. James's proffer, which was part of the agreed procedure, was the $5,000 per month maintenance with additional maintenance of one-third of his net overage. Okay, by the way, Mr. Feinstein, did your client at the trial level submit a proffer, or did only Mr. Billington submit a proffer? She did not, Your Honor, I believe, submit a proffer per se. There was argument before the bench that was Mr. Demling, and he said he wanted a 30 percent of gross, and then ultimately said somewhere between 25 and 30, and opposing counsel was at 33 and a third percent of net, and then the judge said, well, 27.5 percent of net. As to this vehicle, this 2010 Dodge Challenger, whatever it is, it must have been on the proffer for Mr. Billington, but ultimately it went to Mrs. Billington for purposes of driving, or was this for classic car, too? No, my recollection from the record was that, first of all, that it was a gift to her, and secondly, she had sold it at the time, so it was something of a non-issue. Otherwise, he wanted the collectible cars, and he got it, and by the way, there was never any evidence submitted of this $400,000 value for the jewelry. That's something that he submitted, I think, with his motion to consider, and Justice Burkett has also noted that there was no transcript, so I think there are fouch issues galore in this case, in terms of- Right, so what you're arguing now is this issue of how much money can- how much money is Mr. Billington going to make in an average year, and what the percentage of anything over his- $159,000. That's the primary issue we're talking about here, correct? Yes, I mean, the counsel's position is that you can't have a net amount as opposed to a gross amount, but the point is, again, they agreed to the procedure. Each side gave a version. The judge made a ruling, and in all that discussion, which I think took place over a couple of court dates, James's lawyer at the time never told the judge, says, you can't do this under the statute. It's got to be net instead of gross. Didn't give the judge an opportunity to say, okay, well, then let's look at that. That wasn't brought up until later, when we're talking about- the judge ruled, I think, in October of 2020, and then there was all this post-decree action, and that's the first time we're seeing, well, it violates the statute, even though we've taken the position statutory provisions can be waived, and I believe were waived, and as your honor said about the doctrine of invited error, I think that that greatly applies here because this is what they brought to the judge, and the judge said so later on, which is also in my statement of facts, saying, you brought this situation to me. You told me what to decide. You told me what you were going to agree on, and this is what I have. So, the big question that anyone would have is, what was the judge supposed to do? Now, counsel talks about, well, he could have done this, or he could have done that, but- They all seem pretty chummy during these negotiations, didn't they? It does seem, your honor. I mean, I admit I'm from Chicago, but I think there's good camaraderie in the lawyers and in the judges out there in DuPage, and that was the way that they wanted to go about it. Again, you know, James's lawyer said, let's save the people some money. We don't have to gavel every issue, and as you saw, the evidence that came in was fairly brief, but now he doesn't like how it went, and he's saying, well, this procedure was no good, but he agreed to the procedure. I don't see how he gets around that. And whether you're from Chicago or we're from wherever we are, these people are from what we'll now call the fourth district of the appellate court, correct? Peoria Heights, and they can file- I thought, no, Peoria Heights is in the- Peoria is in the fourth now. Used to be in the We don't know, you know, they came here for reasons that aren't- we don't need to know. They talked about what they had. They're getting divorced after 29 years. They have spent almost $7 million. They both admit that that money is gone, and now they have differences, and they know what they've spent. They know what they need, and they've come to agreement. Why can't they do that? And the judge's then responsibility is, is it unconscionable? Is it a fraud, which has not been brought up in this case? And what's been brought up is, did he abuse his discretion? So the bottom line is, why can't he accept their agreement? That's exactly my point, Justice, that he is empowered to do so, and he did the practical thing based on what was presented to him, and he offered they could bring whatever evidence, try whatever issues they wanted, and they said, we're just going to try debts in dissipation, and that's what they did. So these other- Let's talk about your cross appeal. They'd never agreed on reviewable maintenance, correct? That's correct. The judge came up with that. The judge came up with that, and he did it in a way- he came up with a hybrid. He made a baby between a 29-year support, which is under the statute of 29-year marriage, it's supposed to be 29 years of support, or indefinite, what we used to call permanent maintenance. And this review, which is the statute talks about, first of all, it says, shall order maintenance in a 20-plus year marriage, the length of the marriage, or an indefinite term, and then 504b23 says, the court shall state whether the maintenance is fixed term, which this is not, indefinite, reviewable, or reserved by the court. It wasn't reserved. So you're talking about basically indefinite, but reviewable, and you can't do both. That's why the statute was violated, and as a practical matter, and there were no findings made as to why the statutory guidelines of 29 years would have not been followed. And the findings that the judge made very much showed the financial situations of these people. You've got a gentleman who, at the minimum, is making a quarter million dollars a year, and his goal, again, is to build up these companies, and to sell them, and to make millions of dollars, which actually happened. And my client, on the other hand, is actually, I think she was 58 at the time of trial. She had no income earning ability. She had health issues. She was told by her doctor, don't get a stressful job. She said she really can't use a computer. So when we're talking about, you know, possibly losing her maintenance in five years, I just don't see, under any standard review, how that can stand up. And our standard review is an abuse of discretion, correct? As to the maintenance, Your Honor, normally support its abuse of discretion, but I've also alleged that the statute was violated, and that would constitute de novo review in terms of that issue, because again, he violated the statute by making a 29-year but five-year review. Mr. Feinstein, as to dissipation, it appears from the record, as I have reviewed it, and I believe my colleagues have as well, that Mr. Billington did most of the financial work for the family. He paid the bills, things of this nature. He monitored the 529 educational fund. And did your client ever establish what was the dissipation? The dissipation was established, Your Honor, first by the notice of dissipation, which was very detailed and set out everything. And then secondly, per the case law, once the withdrawals are shown, and that's when the burden shifts, and that's our main argument on the dissipation, that the court really put the burden on her rather than on him, which it should have been. But with respect to the dissipation, they kind of tracked it. It was kind of tracked and shown that it was used for the children's school, or if there was excess that was not used for the children's school, it went into a joint account that was used by both the husband and the wife, correct? How is that dissipation? Justice Shostak, I think the operative word in your question is kind of, and that's what is being danced around here in the trial court. He attempted to make this showing, but it has to be clear and specific. And our position is that he really didn't do that. He did not have documentation as to even the amounts of college. There was testimony, well, I guess it's this, or I guess it's that, and they have grants and loans and such. There was no evidence of an affair, no evidence of gambling, no evidence of alcoholism or drug use or any of those types of expenditures that would establish a prima facie case of dissipation, correct? Your Honor, you're absolutely right that it wasn't that kind of a dissipation. It was essentially a failure of proof. Well, it's a suspicion on Monica's part. Is a suspicion enough? But it's more than a suspicion. It's showing this money is gone. It was there, it's gone, it's liquidated. It's his burden to show really with paperwork. But Monica admitted that she ignored, she let James run the show essentially. And she admitted that the parties were living a lavish lifestyle. They were spending a lot of money on the marriage, correct? I agree with that, Justice Burkett. They certainly did as to that. That doesn't negate the fact that some of that, we're not claiming $7 million of dissipation, obviously. It's the hundreds of thousands of dollars that went through and went out, and he didn't show where it went. So that's the essence of the dissipation claim. Again, that the trial court flipped the burden, which is impermissible in a violation of the statute. Well, didn't, Monica could be called to testify on this issue of dissipation, and I believe she was. And didn't she in fact testify, and I'm sort of paraphrasing here, that after reviewing the exhibits that James had presented, she could not determine whether any alleged withdrawals were for other than legitimate family expenses. Isn't that what she testified to? That is true, Justice Hutchinson. And again, that's the flipping of the burden though. Yes, it might have helped her case if she was able to say, oh yeah, this went out here, and this ran. The fact is, as was obvious, she didn't know. He handled everything. And so her testimony is I don't know, but I've charged him with dissipation under the statute properly. He needs showing, which he did not do. So is that a good faith charge of dissipation when you just assume most, not most, but a lot of women let the husband handle. So just because the husband handles all the finances and they don't know it, does that give them the right to raise a dissipation claim? Not by itself, Justice Shostak, but the fact that she doesn't know doesn't mean that she should be punished, because that's the way that a lot of marriages works. Things are either dissipated or they're not. And she did make what I believe is a good faith claim, and I believe that Mr. did not satisfy his burden. And that's the basis for that part of the cross appeal. I see that my time is up. I'll otherwise rest on my briefs unless the court has any other questions we would ask. We appreciate the court's time and appreciate the court's continuing this date. I think you did it once for each of us. We'd ask that you affirm on their appeal and reverse or vacate on our cross appeal. Justice Shostak, anything else? I have nothing further. Thank you so much. Justice Burkett? No. All right. Thank you very much, Mr. Feinstein. And now, Mr. Simarco, if you wish to respond, you may do so. Thank you. You know, I tried to determine repeatedly whether or not there was an agreement between the parties in this case. And the easiest way to find out the answer to that question is to say is to ask yourself this thing right here. What was it specifically that the parties agreed to? If there's an agreement, what was it? Here's what they agreed to on a procedural component and a substantive component. Procedurally, they agreed that James would be paying reviewable maintenance. They agreed to proceed to trial on the issues of debt and dissipation. They agreed to submit proper judgment on the remaining issues in the case and to let Judge Reedy decide the case based on whatever evidence of dissipation he had, whatever evidence of debt he had. And then he was free to pick and choose from the proper judgments and construct his own order. That's the procedural. That's true, but then everything you appealed was agreed upon, too, if you look at your statement. What wasn't agreed to, Your Honor, is the cap on the maintenance. The 257.8 was the base. Off on the gross percentage versus the net percentage. I'm getting to the substantive. They didn't agree to that. The court cannot impose a gross percentage on income to arrive at maintenance because it is directly contradictory to the statute. In fact, the statute prohibits it because the statute says it has to be net. But the court, you're using one section of the statute. The court clearly identifies that his award is a deviation. The court recommended an upward deviation. And if that's the case, then the statutory authority you're relying on is not applicable. Respectfully, Your Honor, you are not correct. Where you're getting that information, you're kind of a little bit confused because the parties presented to Judge Reedy that application of the guideline on 257.8 was about $4,600. And they were going to agree to round it up to $5,000. It would be an upward deviation on the base. Roe says, I want the statute applied. I want it to be net. Whatever's over the 257.8, it's got to be net. Denling says, well, let's do a gross because it's easier that way. I'm thinking somewhere between 30 and 35 gross on whatever he earns over the 257.8. Roe says, it is easier. Let's arrive at 2750. This is the poster child for abuse of discretion and arbitrary ruling. Substantively, what did they agree to? Five grand a month, a slight upward deviation, 60 months review on the base income of 257.8 plus additional maintenance over as we've just been through that. What they disagreed on was the percentage and whether or not it was going to be gross or base. Monica was to receive the West Peoria home. We agree with that. What do we do with the home equity line of credit that encumbered the property? No references made to responsibility for that. James was to receive all the cars in the warehouse. That's in the record of page 101, transcript of proceedings 101. There were six cars in the warehouse. When Monica submitted her proper judgment, she wanted one of them. James could only have five. They are quite a distance apart. Monica says the jewelry is not worth anything. Jim says the jewelry is worth 400,000. He says it's investment quality jewelry. Monica asked that James pay all the freight on the home until it's sale. All the freight on the storage unit until the property is taken out of there. Maintenance to be secured by life insurance. Monica to be adjudicated the innocent spouse. Then suddenly her agreement that the maintenance would be reviewable, she reneges on and in the proper judgment said, wait a minute, I think it ought to be permanent. When you look at these things and you ask yourself, what specifically did they agree to? They agreed to this cockamamie process, which is totally inappropriate. This is judgment. This is arbitrary. We agree that the court can arbitrarily decide. That's where Selecki comes in. The court can't arbitrarily decide. You know, giving or requiring Mr. Billington to pay the about $200,000 HELOC, how can that be arbitrary when this woman has, she's going to get $5,000 a month. And yes, she can sell her worthless jewelry or her $400,000 jewelry, but even he, she's not working. How is she going to pay the HELOC? What is the effect on the overall distribution of the marital estate and assignment of debt when Mr. Billington gets assigned the $200,000 on the HELOC? Do we know that? Well, what we know, what the judge knew and what we know is that this is a 29 year marriage, 29 year, 28.6 year marriage. She has never worked a day outside of the house. Although she certainly, I am a woman working and I think women work, have a job in their home. So she's never worked a day outside of the house. They have gone through six point something million dollars in maybe 12 or 13 years. She doesn't have anything and together they went through everything. These are considerations that I believe the court can took into account. If you look at the judgment that was tendered or actually the judgment that was entered and that's part of this process too. I agree with you, your honor, but how much? There is no clear findings in that judgment as to what the value of the marital estate was, what the debts were, what is the percentage allocated to Jim and what is the percentage allocated to Monica? I said to you, your honor, when Justice Shostak posed her question about permanent versus reviewable, I conceded. All the things you're saying, judge, I conceded. Permanent maintenance was probably better and in line here. However, when we take a look at the distribution of property, reviewable maintenance may be appropriate. That's what the Michelli case tells us. If the recipient of maintenance has received the lion's share of the estate, maybe reviewable maintenance is appropriate. Even indefinite maintenance. Mr. Simarco, your time is up. As I said, we have other orals that we need to get to today and there needs to be some time to breathe between. We've read the briefs. It's obvious from our questions. We've looked at the record. We may have not gotten it all but candidly, this is one of the most, I'll call it convoluted records that I've seen in my 25 plus years on this court. If we didn't get it straight, it ain't necessarily our fault. Justice Burkett, any other questions? No. Thank you, judge. Justice Shostak? I have no other questions. Thank you, gentlemen. Thank you very much. This was a very interesting argument and a very interesting case. We will start. I'm sorry. Do I not get my five minutes of rebuttal on the cross appeal? I'm sorry. Well, you can, but what? All right, fine. It won't be five minutes. It won't be five minutes. Okay. If I may, because I have to take exception to a couple of things counsel said about the record. Again, he claims that Monica agreed somehow or somewhere to reviewable maintenance. I searched the record. I set out in my red brief that counsel didn't cite the record for that proposition and I didn't find it and it didn't happen. In fact, what I then cited, page two of my red brief talked about the objection she had to reviewable maintenance, which would be a violation of the statute as well as abuse of discretion. But that was not something, that was something that the judge came up with on his own. It wasn't something they agreed to. Correct? Exactly. Your honor. That's, that's my point. Counsel claimed we agreed to it. He also, Mr. Rowe did not say at the time, contrary to what counsel just told you, that it's got to be net under the statute at that time. That came later after the arguments and after the ruling. That's why I'm talking about waiver and invited error. The Selecki case was a child support case. It's very different. You can't rewrite the statute or bypass it in child support situations. Maintenance is very different, as you know, from the Michelli case. And also, he cites the Michelli case in terms of the maintenance situation. My client is in a very different position than Ms. Michelli. I would otherwise ask, again, that the court affirm on the appeal and reverse or vacate on the cross appeal, unless there are any other questions. And I thank you for the time. All right. I think we've covered everything now. And we do appreciate your argument. We will make a decision in due course. We appreciate your presence here today. And we will stand in recess pending the next case. Thank you very much. You're all excused at this point.